Argued and submitted August 28, 1991, decision of Court of Appeals reversed, judgment of circuit court reversed and case remanded to circuit court for further proceedings October 29, 1992

In the Matter of the Marriage of

Daniel B. FROMDAHL,
*Respondent on Review,*

*and*

Heather R. FROMDAHL,
*Petitioner on Review.*

(CC DO89-1378; CA A65526; SC S37960)

840 P2d 683

Suanne Lovendahl, Oregon Legal Services Corporation, Roseburg, filed the petition and argued the cause for petitioner on review.

Inge D. White, Roseburg, filed the response and argued the cause for respondent on review. With her on the response were Dan W. Clark, and Dole, Coalwell & Clark, P.C., Roseburg.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

The underlying issue in this dissolution case concerns the custody of the parties' children. Father sought custody on the ground that mother suffered from a mental illness that caused her to believe that the children had been sexually abused, and that when she was under the influence of this delusion her functioning as a parent was impaired. The trial court excluded certain evidence proffered by mother to show that her perception that the children had been abused and her responses thereto were rational and appropriate. The trial court awarded custody to father. The Court of Appeals affirmed without opinion. *Fromdahl and Fromdahl*, 105 Or App 636, 805 P2d 759 (1991). We conclude that the trial court erred in excluding certain evidence proffered by mother. Because the court excluded evidence that was relevant to the issue of custody, we reverse and remand for further proceedings.

The parties were married in 1973. They have two children, Olivia, born in 1979, and Andrew, born in 1983. During the marriage, mother worked outside the home part-time, filled the role of homemaker, and was the children's primary caretaker.

In October 1987, mother told father that she believed that Andrew had been sexually abused by a neighbor child. Her belief was based primarily on what Andrew had told her. Mother and father spoke to the neighbor child's parents twice about the matter. About the same time, Andrew told father that "the neighbors across the street" had abused him. A few days later, mother told father that Andrew had accused *father* of sexually abusing him. Mother took Andrew to the hospital to be examined. The findings of the doctors who examined Andrew for objective physical evidence of abuse were inconclusive.

In November 1987, mother told father that she had been raped in her own home and that she was afraid to go to his mother's home, because she would be raped there as well. Mother also told father that the children were being abused by his mother, that she believed that Andrew had been abused by the principal of the local school, and that she had "suspicions" about the family pediatrician. Father took mother to

the hospital, where she spent the night in a psychiatric ward.[1] She returned home the next day and took medication for several days, after which, with father's concurrence, she discontinued the medication. In December 1987, based on mother's allegations that father had "abused the children and also had allowed them to be abused by others," father was served with a restraining order ordering him out of the family home.

In January 1988, father and the parties' pastor initiated involuntary mental commitment proceedings against mother. Dr. Middlekauff, mother's examining psychiatrist at the commitment proceeding, diagnosed her condition as schizophreniform disorder,[2] characterized by a loss of touch with reality. On January 6, mother was involuntarily committed to the Mental Health Division and was placed at Dammasch State Hospital, where she remained until February 18. Mother's condition on discharge from Dammasch was diagnosed as: "[R]eactive delusional disorder (mild) with paranoid features." The professionals who examined mother all agreed that the trauma of her children's allegations of sexual abuse had precipitated her illness. Dr. Carey, a psychologist who evaluated mother at Dammasch, recommended that "care should be taken to carefully and professionally evaluate the children's allegations of sexual abuse." Thereafter, the family reunited, participated in counseling with Doug Eckstein, a county mental health counselor who works with Dr. Middlekauff, and participated in private counseling.

In March 1988, at the request of Detective Shelander, who was investigating the complaint that Andrew had been sexually abused, father took a polygraph examination. The polygraph examiner concluded:

[1] At trial, father testified that he initially considered taking mother to a motel to get some rest but that, because the cost would be paid by his medical insurance, he decided to take her to the hospital. He professed surprise that she was placed in a psychiatric ward. It is not clear from the record whether mother was in the psychiatric ward because the hospital staff thought she belonged there, or because the only empty bed in the hospital that night was in that ward.

[2] 
"The essential features of this disorder are identical with those of schizophrenia, with the exception that the duration, including prodromal, active, and residual phases, is less than six months." Diagnostic and Statistical Manual of Mental Disorders 295.40 (3rd ed rev 1987).

"There were consistent deceptive responses to the * * * relevant questions that were sufficient enough to draw a conclusive opinion as to [father's] deceptiveness to those relevant questions."

Later in March 1988, at Eckstein's request, Marilyn Gregory, a Children's Services Division (CSD) child and adolescent treatment specialist, saw the children. In her report, Gregory concluded:

"[I]n light of Andrew's drawing and statements, it's clear that he has been sexually abused, I suspect both by his father as well as two neighborhood children. He identified the two neighborhood children * * *. This information, in addition to [Andrew's] previous statement, as well as his father failing the polygraph, lead me to believe with no question that his father is or has been sexually abusing him * * *."

Gregory further concluded:

"Andrew seems quite clear in his statement about what happened to him. Olivia appears much more frightened and confused. In my opinion, with [father's] having flunked the polygraph, it's highly likely that the children have been sexually abused by their father as well as perhaps by those other neighborhood children. I'm also concerned as to [mother's] ability to protect the children at this point as she is staunchly supporting her husband at this point and is only just recently recovering from a psychotic break and seems to be quite fragile."

Mother talked to Gregory about her interviews with the children, and the information in Gregory's report was known to mother as well.

Over the course of the next year, the parents attempted to stabilize their relationship with the assistance of a private counselor, and friends from their church. In March 1989, mother's belief that the children had been sexually abused in the past resurfaced, although she did not contend that the abuse was continuing.[3] Mother again began accusing father of having sexually abused the children. Father identified March 1989 as being the time that mother's

---

[3] The record is not clear as to what caused mother's belief to resurface at this time. The trial court sustained father's objection to the admissibility of the information that caused mother's belief to resurface. Mother did not specifically challenge that ruling on appeal.

"psychotic incidents" resumed. About that time, mother contacted Detective Shelander. He told her that he was not surprised to see her again and that, although he personally believed that father was sexually abusive, there was nothing that he could do about it. The family resumed private counseling.

The counselor that the parties were seeing had obtained as many records as he could about the investigation of Andrew's complaints that his father had sexually abused him. These included a report of the polygraph examination that father had taken in March 1988. In April 1989, during counseling, mother first saw the polygraph examiner's report. In May, the counselor, together with a pastor and his wife who had provided marital counseling to the parties, confronted father about the alleged abuse. He denied misconduct. By agreement, the children were scheduled to be examined by a physician. Because of Andrew's statements during the examination, the physician referred the case to CSD for investigation, but no charges were brought. The situation at home became increasingly difficult.

In June 1989, mother contacted a lawyer, who could not see her until mid-August, but referred her and the children to a local shelter for victims of domestic violence. Before taking the children to the shelter, mother made an unsuccessful attempt to obtain assistance from Legal Aid. Mother and the children stayed at the shelter for three days and then returned home.[4]

On July 21, 1989, without notice to father, mother took the children to Tennessee,[5] where she obtained an order from a Tennessee juvenile court giving her temporary custody of the children. The same day, the children were examined by a doctor and met with a psychiatrist. Those examinations did not confirm mother's suspicions. Several weeks passed before father was able to locate mother and the

---

[4] Mother asserted in an October 25, 1989, affidavit that, in July 1989,

"[father] abruptly informed me that neither he nor the children would undergo any further counseling and threatened that if I or the children persisted in the allegations against him, he would see that I was separated from the children."

[5] Father does not argue that mother violated any Oregon law in taking the children to Tennessee. *See* ORS 163.215 *et seq* (kidnapping and custodial interference).

children. Given the conflict between father's allegation that mother was mentally unstable and her allegation that father had abused the children, the Tennessee juvenile court placed the children in the temporary custody of that state's Department of Human Services.

In October 1989, while the children were in Tennessee, father was given temporary custody of the children by an Oregon court. Later that month, the Tennessee juvenile court relinquished jurisdiction over the children and directed that they be returned to Oregon.[6] Also in October 1989, father petitioned in Oregon for dissolution of the marriage, seeking permanent custody of the children subject to supervised visitation by mother. He also asked for temporary custody of the children, alleging that mother was "not mentally stable" and had taken the children to Tennessee. A few days later, he sought an immediate temporary custody order and asked the Oregon court to assume and exercise jurisdiction under the Uniform Child Custody Jurisdiction Act, ORS 109.730 *et seq.* After a hearing, the Oregon court assumed jurisdiction and awarded father temporary custody of the children. Since October 1989, the children have resided with father in the family home. Mother has had supervised visitation.

At trial in May 1990, mother testified that she provided "about ninety-eight percent of the child care to the children." Father testified that mother was the children's primary caretaker, her relationship with the children was good, and "she was a very nurturing mother." He expressed satisfaction with his family life until October 1987.

The custody issue focused on whether mother's perceptions about the sexual abuse of the children and her responses thereto were rational or delusional. Father argued that mother's belief that he had sexually abused the children was the result of her mental illness and that her resulting conduct was contrary to the best interests of the children. He testified, "I do not say that [the children] have never been abused. I do say that they have never been abused by me or by

---

[6] The Tennessee juvenile court found that it had emergency protective jurisdiction only and concluded that Oregon was the proper jurisdiction to consider the custody issue pursuant to the Uniform Child Custody Jurisdiction Act.

any of the people that have been accused formally or informally by my wife." Father suggested that none of the statements about sexual abuse of the children on which mother relied were, in fact, made to her; that she only thought that they were made to her because of her delusional state. Mother argued that, in view of the information available to her, her perceptions and responses were rational and reasonably calculated to protect her children and to promote their best interests. Mother offered evidence of statements about the sexual abuse of the children made to her by the children and by others to show that her belief that the children were being sexually abused by father and that they were in danger was rational, and that, under the circumstances as she believed them to be, her responses to that belief were appropriate.[7] The children did not testify.

Eckstein, who had ten years of counseling experience working with sex offenders and the victims of sexual abuse, opined without objection that father had sexually abused the children. In Eckstein's opinion, "the abuse [of the children] had occurred and the family had closed ranks afterwards." In forming his opinion, Eckstein relied, in part, on Gregory's report, which reached essentially the same conclusion.[8] Mother was aware that Andrew had reported to Gregory in March 1988 that his father had sexually abused him.

In an effort to show that, based on the information available to her, her perceptions and responses thereto were rational and appropriate, mother offered the polygraph examiner's report and her testimony about her knowledge of the report's conclusion. Father objected, arguing (1) that polygraph evidence is *never* admissible in a civil trial in Oregon, citing *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. Lyon*, 304 Or 221, 744 P2d 231 (1987);

---

[7] Father recognizes the nature of mother's argument and the evidence that she offered to support it. In his response to mother's petition for review, father acknowledges that

"mother argued at trial that her entire course of conduct was attributable to the fact that her children had been abused, and no one would pay the proper attention to her allegations."

[8] Eckstein testified that the information that he relied on to evaluate allegations of sexual abuse within a family included statements of family members, information from police agencies and CSD, evaluations by therapists, and polygraph examination results.

and (2) that mother's testimony about her knowledge of the report's conclusion likewise was inadmissible under *Brown* and *Lyon*.[9] "[P]olygraph evidence which is not hearsay is still inadmissible," father argues.

Mother's lawyer explained at trial why she thought that the evidence was admissible:

"It's true that polygraph exams are inadmissible for purposes of proving the truth of the matter asserted therein. The entire matter in this case is whether [mother's] behavior was unreasonable in terms of her flight, whether she acted in the best interests of the children. From that standpoint the information that was available to her that caused her to believe that the children were in danger is crucial to her state of mind and so we're proposing that *it is pertinent and admissible as nonhearsay for purposes of showing the information that caused her to act and behave in the way she did.*

"\* \* \* \* \*

"*[I]t's not hearsay and it's not being used as proof of the matter asserted.[10] It's only being used to show the state of mind of [mother]* so I felt that it was information that she acted on as any statement that she would have gotten just as state of mind. It's not being introduced as substantive evidence and we have no intention of trying to prove that he's guilty of child abuse; that's not our point. We're trying to prove that she acted reasonably given the information that she had and that information would affect her behavior and I think that *it's essential that that be allowed to be considered by the Court for its effect on her because it was a key piece of information in terms of how she acted.*" (Emphasis added.)

The trial court sustained father's objection based on "the cases that exclude polygraph [evidence]."

---

[9] Father did not argue specifically at trial that the court should exclude the evidence under OEC 403 (relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice). *See State v. Mayfield,* 302 Or 631, 641, 644-47, 733 P2d 438 (1987) (relevant non-hearsay evidence may be excluded under the OEC 403 relevancy balancing test); *Sheedy v. Stall,* 255 Or 594, 597, 468 P2d 259 (1970) (pre-OEC) (where the out-of-court statement has relevancy both as evidence that the statement was made and also as evidence of the fact asserted in the statement, this does not render the statement inadmissible, but limits the use to which the statement can be put).

[10] OEC 801(3) provides:

" 'Hearsay' " is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Next, mother offered her testimony about statements made to her by the children and by Detective Shelander about sexual abuse by father and her testimony about her knowledge that Andrew had repeated his complaint about sexual abuse by father to other professionals who had investigated the matter. The trial court sustained father's objection to that evidence based on hearsay grounds. The trial court also sustained father's objection to Gregory's report on hearsay grounds. Thus, all of mother's trial testimony and documentation about the information that she argues caused her to believe that the children were being sexually abused by father and that motivated her to act as she did was excluded. The evidence was preserved in the record by an offer of proof. OEC 103(1)(b).

At the conclusion of the trial, the court made the following findings:

"The parties are contesting all issues in this dissolution. The central issue, however, is custody of the children. Although the parties have not litigated the issue of sexual abuse of the children, the issue focused upon whether [mother's] reactions were rational and reasonable. Neither party called the children as witnesses. The evidence provided to the Court does not prove the existence of sexual abuse by any person by a preponderance of the evidence. Therefore, the court must set aside that issue.

"In judging what is in the best interests of the children, the Court must conclude that custody should be awarded to [father]. [He] is the most stable parent. There are several factors considered by the Court in making this decision. [Father] has remained in steady employment. He has the children in the family home. He has demonstrated commitment to the children. The emotional and financial drain caused by [mother's] mental illness and her removal of the children from the State has demonstrated the need for a stable, nurturing environment. The court finds Dr. Middlekauff's diagnosis credible. [Mother] was delusional. * * * The diagnosis and the transient lifestyle [mother] has experienced since July 1989 demonstrates [mother] has not recovered mental stability * * *."

Accordingly, the court awarded custody of the children to father. On mother's appeal, the Court of Appeals affirmed without opinion. *Fromdahl and Fromdahl, supra.*

Mother first contends that the trial court erred in sustaining father's objection to the polygraph report and to her testimony about her knowledge of the report's conclusion. She argues that the evidence is not hearsay, because it was offered not to prove the truth of the matter asserted, *i.e.*, that father has sexually abused the children but, rather, to show its effect on her state of mind and to explain why she acted as she did. Mother further argues that *State v. Brown, supra*, and *State v. Lyon, supra*, cannot fairly be read to bar admission of this evidence for the purpose that it was offered here.

In *State v. Brown, supra*, this court considered whether unstipulated polygraph evidence should be admitted in a jury trial "to prove the truth of the matter asserted," *i.e.*, whether the subject of a polygraph test was deceptive. The court concluded that "under proper conditions polygraph evidence may possess some probative value and may, in some cases, be helpful to the trier of fact." *State v. Brown, supra*, 297 Or at 438. The court concluded, however, that such evidence nevertheless should be excluded under OEC 403. *Id.* at 442.[11] Moreover, the court stated:

"OEC 608(2)[12] expressly prohibits the admission of evidence of specific instances of conduct of a witness [other than

---

[11] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

The court's primary concern in *State v. Brown*, 297 Or 404, 439, 687 P2d 751 (1984) was "the degree to which the trier of fact may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence, thereby leading the trier of fact to abdicate its role of critical assessment." "Polygraph evidence," the court concluded, "may well divert the trier of fact from the direct and circumstantial evidence presented in a case to a distorted valuation of the polygraph evidence. * * * By its very nature the polygraph purports to measure truthfulness and deception, the very essence of the jury's role." *Id.* at 440-41; *see* ORS 44.370 ("Where the trial is by the jury, they are the exclusive judges of the credibility of the witness"). *See* Note, *Oregon's Approach to the Admissibility of Polygraph Evidence: State v. Brown*, 21 Willamette L Rev 167 (1985) (questioning the validity of many of this court's concerns in *State v. Brown*). We need not decide in this case whether the concerns identified by this court in *State v. Brown, supra*, and *State v. Lyon, supra*, are equally present in a case tried to the court without a jury.

[12] OEC 608(2) provides:

"Specific instances of the conduct of a witness, for the purpose of attacking or supporting the credibility of the witness, other than conviction of crime as provided in [OEC 609], may not be proved by extrinsic evidence. Further, such

certain convictions of crime[13]] for the purpose of attacking or supporting the credibility of the witness. If, as in this case, a witness has passed a polygraph examination, the polygraph result constitutes a specific instance of conduct of the witness being offered for the purpose of supporting the credibility of the witness. Such extrinsic evidence is inadmissible under OEC 608(2)." 297 Or at 443.

In *State v. Lyon, supra,* 304 Or at 233-34, this court refused to admit polygraph evidence in a jury trial, even though the admissibility of the evidence had been stipulated to by the parties, and broadly stated in *dictum* "that polygraph evidence is inadmissible for any purpose in any legal proceeding subject to the rules of evidence under the Oregon Evidence Code. * * *"

Neither *Brown* nor *Lyon* presented the question we address in this case, *i.e.*, whether polygraph evidence may be introduced to show its effect on a person's state of mind. Both cases presented the separate (and more limited) question whether polygraph evidence may be admitted in a jury trial to prove the truth of the matter asserted. *State v. Brown, supra,* 297 Or at 407; *State v. Lyon, supra,* 304 Or at 224. Indeed, mother argues that this court's reasons for the exclusion of polygraph evidence in *Brown* and *Lyon* compel the *admission* of her polygraph evidence here, where the issue for adjudication is her state of mind and the effect of the evidence on her. She argues:

"If the aura of reliability of polygraph tests is so prejudicial that a jury cannot be trusted to give them overriding weight, then depriving mother accused of acting on delusions of the opportunity to introduce and testify concerning a polygraph examination that contributed to her belief that her husband had sexually abused her children makes a mockery of justice."

---

specific instances of conduct may not, even if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness."

[13] OEC 609(1) provides:

"For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record, but only if the crime (a) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, or (b) involved false statement or dishonesty."

In this case, father introduced evidence of mother's conduct that he argued was the product of her mental illness and was contrary to the children's best interests. He relied primarily on that evidence as grounds for an award of custody to him. Mother offered the polygraph examiner's report and testimony about her knowledge of its conclusions to show its effect on her state of mind and to support her argument that, in view of the evidence available to her, her perceptions and responses thereto were rational and appropriate.

■■ Notwithstanding this court's holding in *Brown* and our broad *dictum* in *Lyon*, after reviewing the factors that led to this court's reasons for the exclusion of polygraph evidence in *Brown* and *Lyon*, and considering the context in which this case developed and the reason for which mother offered the polygraph evidence, we conclude that the trial court erred in sustaining father's objection to the polygraph report and mother's testimony about her knowledge of the report's conclusion on the ground that, without exception, polygraph evidence is *never* admissible in an Oregon court.[14] Given the particular purpose for and the narrow context in which it was offered, mother's evidence was admissible.

Mother next contends that the trial court erred in sustaining father's objection on hearsay grounds to her testimony about statements made to her by the children and by Detective Shelander. She argues that her testimony about those statements was not hearsay, because it was not offered to prove the truth of the matter asserted, but as circumstantial evidence of her state of mind and to explain why she acted as she did. Offered for that purpose, the evidence was not hearsay, OEC 801(3), and the trial court erred in excluding it.

■ Mother also contends that the trial court erred in sustaining father's objection on hearsay grounds to Gregory's report. She argues that Gregory's report was not hearsay, because it was not offered to prove the truth of the matter asserted, but as circumstantial evidence of her state of mind, that is, to explain why she acted as she did. Mother also offered the report to corroborate her assertion that, in fact,

---

[14] Father also objected to this evidence on hearsay grounds. Mother offered the evidence to show its effect on her state of mind and to explain why she acted as she did on learning about the report's conclusion. Offered for that purpose, the evidence was not hearsay. OEC 801(3). Father's hearsay objection therefore is not well taken.

she had heard from Gregory about the children's complaints and that she was aware of Gregory's conclusions. As noted above, father suggested that the statements that mother testified she had heard about his having sexually abused the children really were "what Mother believed that she [had] heard," *i.e.*, that she only imagined such statements were made to her by others.[15] The trial court at first admitted the report under OEC 703,[16] but later excluded it "because it contained hearsay."

Mother did not offer Gregory's report as opinion testimony to prove the truth of the matter asserted. Rather, she offered it as relevant circumstantial evidence of the report's effect on her, that is, to explain why she acted as she did. Offered for that purpose, the evidence was not hearsay, OEC 801(3), and the trial court erred excluding it.

In summary, we hold that the trial court erred in sustaining father's objections to the polygraph examiner's report and mother's testimony about her knowledge of the report's conclusion, in sustaining father's objection on hearsay grounds to mother's testimony about statements made to her by the children and by Detective Shelander, and in sustaining father's objection on hearsay grounds to Gregory's report.

Finally, we turn to the question of the disposition of this case. The issue here is custody. Mother argues that the trial court erred as a matter of law in excluding her proffered evidence and that the court's erroneous rulings were prejudicial to her, because the court thereby deprived her of any meaningful way to explain why she acted as she did and to rebut father's argument that he should be awarded custody because she was mentally unstable and was not acting in the children's best interests. She asks this court on *de novo*

---

[15] In his brief in the Court of Appeals, father recognizes that "this distinction makes a critical difference in whether Mother's conduct was reasonable" and that the testimony is probative of "Mother's perception of reality."

[16] OEC 703 provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

review to award custody of the children to her. Father argues that, even if the excluded evidence is considered by this court on *de novo* review, rather than remand this case for the trial court to consider additional evidence, this court should defer to the trial court and award custody to him, because the trial court had the opportunity to observe the witnesses. *See Smith and Smith*, 290 Or 567, 572, 624 P2d 114 (1981) (the decision of the trial court on the issue of what is in the best interests of the child is highly persuasive).

Because of the trial court's heavy reliance on mother's instability and father's comparative stability as the basis for its custody decision, when custody was the very issue to which mother's excluded evidence was relevant, we conclude that this case must be remanded to the trial court for a reexamination of the custody issue in the light of the whole record, including mother's evidence that the court erroneously excluded. We express no opinion about how the trial court should decide the custody and related issues of visitation and child support on remand.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed. The case is remanded to the circuit court for further proceedings.