Argued and submitted January 3, judgment of conviction affirmed and sentence of death affirmed May 12, 1994

## STATE OF OREGON,
*Respondent,*

*v.*

## RANDAL LOYAL SMITH,
*Appellant.*

## (CC C90-1537CR; SC S39030)

872 P2d 966

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender, Salem.

Brenda J P Rocklin, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Amy E. Alpaugh, Janet A. Metcalf, and Kaye E. Sunderland, Assistant Attorneys General, Salem.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Unis, and Graber, Justices.

UNIS, J.

Fadeley, J., dissented and filed an opinion.

## UNIS, J.

This case is before this court on automatic and direct review of a judgment of conviction for aggravated murder and sentence of death, ORS 163.150(1)(f). Defendant seeks reversal of his convictions for aggravated murder and attempted aggravated murder.[1] In the alternative, defendant asks this court to vacate his sentence of death. We affirm defendant's convictions and sentence of death.

On September 20, 1990, defendant entered a bank in Washington County. There were two employees of the bank present, both tellers. Defendant went directly to one teller's area. At gunpoint, he demanded that the teller put money in a paper bag that he had brought with him to the bank. After the teller complied with defendant's demands, defendant stepped forward to within a foot of the teller and said, "Look at me." With the barrel of his gun within an inch or two of the teller's forehead, defendant shot her fatally. Defendant then said to the other teller, "Come here." That teller ducked behind a counter and ran out of the bank. As the surviving teller left the bank, defendant shot at her. The teller fled to a nearby restaurant, where she called the police. Later that day, defendant was arrested.

Defendant pleaded not guilty to charges of aggravated murder and attempted aggravated murder. Before trial, at the request of defense counsel, two separate hearings before two different circuit court judges were held to determine whether defendant was competent to stand trial.[2] The

---

[1] ORAP 12.10(2) provides:

"If, in addition to a conviction for aggravated murder forming the basis for the death sentence, a defendant is convicted of one or more charges arising from the same charging instrument, the Supreme Court shall have jurisdiction to review any such conviction without the filing of a notice of appeal."

[2] ORS 161.360 provides:

"(1) If, before or during the trial in any criminal case, the court has reason to doubt the defendant's fitness to proceed by reason of incapacity, the court may order an examination in the manner provided in ORS 161.365.

"(2) A defendant may be found incapacitated if, as a result of mental disease or defect, the defendant is unable:

"(a) To understand the nature of the proceedings against the defendant; or

"(b) To assist and cooperate with the counsel of the defendant; or

"(c) To participate in the defense of the defendant."

first hearing, held in December 1990, lasted five days. At the conclusion of that hearing, a circuit court judge found that defendant was able to aid and assist in his defense. That judge said that he was "not convinced by a preponderance of the evidence that the defendant suffers from a major mental disease or defect as defined * * * in ORS 161.295." In support of his findings, the judge noted that all of the experts who had testified "found the defendant capable of understanding the nature of the proceedings against him" and that the only evidence that defendant was "unable to assist or cooperate with counsel or to participate in his defense" was that he remained mute. The judge further found that defendant was "electively mute" and that, if he chose to remain mute during trial, his muteness would not interfere with his ability to aid and assist his lawyer. The judge explained:

> "If I had found that the defendant did suffer from a mental illness or a mental disease or defect as defined by the statute and if that resulted in him electing to remain mute, I would have found him incompetent if I determined that the muteness resulted in him being unable to adequately communicate with his counsel. But all the evidence I've heard in this case indicates that the defendant historically, during periods of incarceration and hospitalization and out in society, even when mute, has been quite effective in written communication.

> "Additionally, he has communicated in other nonverbal ways which might be less satisfactory insofar as mounting a defense, but his written communication has, frankly, been quite good.

> "If I'm wrong in my first decision and the defendant does suffer from a major mental illness, it is only substantial — it has only substantially affected his ability to communicate orally. He remains quite capable of communicating in writing, as had been demonstrated, as I said, over the years.

> "Had I found the defendant to suffer from a major mental illness, I nevertheless would have been required to find him fit to proceed because the evidence is quite substantially lacking on the point of inability to communicate sufficiently to assist and to cooperate with counsel.

> "For all these reasons, I find the defendant fit to proceed."

On January 10, 1992, after the trial judge had denied defense counsel's motion to waive a jury trial, a matter which we discuss *infra*, defendant's lawyer asked the trial judge to re-examine the question of defendant's competency to stand trial. The trial judge agreed. He reviewed the evidence from the prior competency hearing and heard additional testimony. The trial judge concluded that defendant was able to aid and assist in his defense. In an order dated January 30, 1992, he found:

"1. That it is more probable than not that defendant has a personality disorder;

"2. That even if defendant is schizophrenic, mutism is volitional, under defendant's control;

"3. That defendant does not meet the criteria in ORS 161.360 excluding fitness to proceed;

"4. That defendant is legally competent to stand trial."

Defendant does not challenge either judge's competency ruling in this court.

At trial, defendant did not contest that he had engaged in the criminal conduct. Instead, the defense relied on the affirmative defense of mental disease or defect, *i.e.*, "guilty except for insanity," ORS 161.295.[3]

A jury found defendant guilty of one count of aggravated murder and one count of attempted aggravated murder. Following the findings by the jury during the penalty phase, the trial judge entered a judgment sentencing defendant to death on the conviction for aggravated murder and to incarceration for a period of 60 months on the conviction for attempted aggravated murder.

■ Defendant asserts several assignments of error. Defendant first contends that the trial judge erred in refusing

---

[3] ORS 161.295 provides:

"(1) A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law.

"(2) As used in chapter 743, Oregon Laws 1971, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."

to allow his lawyer to waive defendant's right to trial by a jury and to proceed with a bench trial because defendant was unable to waive that right himself.

Before trial, defendant's lawyer submitted to the trial judge in defendant's presence a written request to waive trial by a jury. The written request was signed by defendant's lawyer, but was not signed by defendant. The trial judge asked defendant, who, as previously stated, had been found by another trial court judge to be capable of aiding and assisting in the presentation of his defense,[4] if defendant had any objection to execution of the written waiver request by his lawyer on defendant's behalf. Defendant did not respond to the trial judge's question. The trial judge then denied the request by defendant's lawyer to waive defendant's right to trial by a jury.

Article I, section 11, of the Oregon Constitution provides in part:

> "In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * *; provided, however, that any accused person, *in other than capital cases*, and with the consent of the trial judge, may elect to waive trial by jury and consent to be tried by the judge of the court alone, such election to be in writing * * *." (Emphasis added.)

By necessary implication, the emphasized quoted language of Article I, section 11, requires that the defendant in a capital case, such as defendant in this capital case, is to be tried only by a jury.[5] Because trial by a jury is compulsory in a capital case, the trial judge did not have authority to permit defendant to waive trial by jury and to proceed in a bench trial. The trial judge, therefore, did not err in refusing to allow the written request by defendant's lawyer to waive defendant's right to trial by a jury.

---

[4] As previously noted, defendant does not challenge the correctness of that ruling.

[5] Article I, section 11, of the Oregon Constitution originally provided in relevant part: "In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * *." Or Const, Art I, § 11 (1859). Article I, section 11, was amended by referendum in 1932 to provide explicitly that defendants in non-capital cases could waive a jury trial with the trial court's consent and be tried before the court. Or Laws 1933 (constitutional amendments), p 5.

■ Defendant next contends that the trial judge improperly excluded testimony during the guilt phase of the trial concerning the length of time that defendant would likely spend in the state hospital if he were found guilty except for insanity. During the second redirect examination of Dr. Johannsen, a psychologist called to testify on defendant's behalf, defense counsel inquired:

"[Defense Counsel]: Based on [the prosecutor's] last line of questioning, Dr. Johannsen, in a case like [defendant's], if he were found guilty except for insanity, what would be the likely outcome in terms of how much time he would spend in the State Hospital?

"[Prosecutor]: Objection, that's clearly speculative.

"[The Court]: Sustained."

■ Although defense counsel thereafter made an offer of proof on another issue, he did not make an offer of proof on this issue.[6] OEC 103(1)(b)[7] provides that error may not be predicated on a ruling excluding evidence unless the substance of the evidence was made known to the court by offer of proof or was apparent from the context within which the question was asked. *See State v. Busby*, 315 Or 292, 298, 844 P2d 897 (1993) (discussing principle); *State v. Olmstead*, 310 Or 455, 459-60, 800 P2d 277 (1990) (same).[8] The primary purpose of the offer of proof is to enable an appellate court to

---

[6] Although the trial judge sustained the prosecutor's objection on the ground that defense counsel's question called for speculative evidence, defendant does not address that issue before this court. Instead, he argues before this court that the prosecutor's questioning on recross-examination "opened the door" to Dr. Johannsen's testimony. Because that ground for admission was not clearly argued in the trial court, *see State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988) (positions of the parties should be clearly presented to the initial tribunal), we will not consider it.

[7] OEC 103(1) provides in part:

"Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:

"* * * * *

"(b) In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

[8] *See also State v. Affeld*, 307 Or 125, 764 P2d 220 (1988) (ordinarily, when a trial court excludes testimony during direct examination or cross-examination, an offer of proof is required to preserve any claim of error related to what the evidence would have shown).

determine whether the exclusion was erroneous and, if so, harmful, *i.e.*, whether the error affected a substantial right of the appellant. *State v. Busby, supra*, 315 Or at 298. Other purposes are to permit the trial judge to reconsider his or her ruling in view of the actual evidence to be offered, 1 McCormick on Evidence 195-96, § 51 (4th ed 1992), and to enable opposing counsel to take appropriate action, *Christinson v. Big Stone County Co-op.*, 13 F3d 1178, 1180 (8th Cir 1994).

Here, the absence of an offer of proof precludes this court from evaluating whether Dr. Johannsen's testimony was properly excluded. From this record, it is not even apparent that Dr. Johannsen would have been able to express *any* opinion as to how long defendant might be held at the state hospital. During earlier questioning, he acknowledged that the length of time that a patient might spend at the hospital was up to the Psychiatric Security Review Board. Moreover, not knowing what his answer would have been makes it impossible for this court to determine whether exclusion of the testimony, if it was error, was harmful error.[9] As the state points out, had Dr. Johannsen said that defendant would spend significantly less time in the state hospital than he would in prison, the trial judge's exclusion of this testimony presumably would have helped, not hurt, defendant's case.

■ Defendant next claims that the trial judge "erred in limiting defense counsel's direct examination of psychiatrist Janzer." Specifically, defendant asserts that evidence should have been admitted that he did not respond to defense counsel's attempt to encourage him to waive a jury trial. According to defendant:

> "The trial [judge] excluded testimony by psychiatrist Janzer that defense counsel had attempted to get defendant to waive a jury trial in Janzer's presence. The trial [judge] held that the evidence concerning the proposed jury trial waiver was irrelevant.[10] Janzer was allowed to testify about his observations of defendant's reactions to counsel, but he was not

---

[9] "[A] substantial right of a criminal defendant is not affected if there is * * * little likelihood that the error affected the verdict." *State v. Hansen*, 304 Or 169, 180, 743 P2d 157 (1987) (citing *State v. Miller*, 300 Or 203, 220-21, 709 P2d 225, *cert den* 475 US 1141 (1985)).

[10] As discussed *infra*, that argument is somewhat miscast: the trial judge did not hold that evidence concerning the proposed jury trial was irrelevant.

allowed to mention the jury trial waiver. Defendant submits that the testimony should not have been sanitized in that manner."

During defendant's case-in-chief in the guilt phase of the trial, defense counsel advised the trial court that he wanted to present testimony that he had explained to defendant, in Dr. Janzer's presence, defendant's "options for going to trial — especially, but not limited to, the offer that the State had made to waive the death penalty if [defendant] would personally waive a jury trial"[11] and that defendant's silence under those circumstances was not to his advantage. The trial judge expressed concerns about getting into "quasi plea negotiations" and advised defense counsel that the information sought from Dr. Janzer could be obtained "without talking precisely about the fact that there was this, in essence, kind of a 'quasi plea offer' " in this case.[12]

The court did *not*, as defendant asserts, exclude the reference to "jury trial waiver" because such evidence was "irrelevant." Rather, the court directed defense counsel to use the words "[t]rial strategies that require [defendant's] consent which would substantially minimize his potential exposure to the death penalty" in lieu of mentioning "jury trial waiver" because of concerns about getting into "quasi plea negotiations" and because of the danger of unfair prejudice to defendant and the state. The court determined that

---

[11] As stated *infra*, no plea offer had been extended to defendant.

[12] Plea discussions and plea agreements are inadmissible "for or against a defendant in any criminal * * * proceeding." ORS 135.435. That statute provides:

"(1) Except as provided in subsection (2) of this section, none of the following shall be received in evidence for or against a defendant in any criminal or civil action or administrative proceeding:

"(a) The fact that the defendant or the counsel of the defendant and the district attorney engaged in plea discussions.

"(b) The fact that the defendant or the attorney of the defendant made a plea agreement with the district attorney.

"(c) Any statement or admission made by the defendant or the attorney of the defendant to the district attorney and as a part of the plea discussion or agreement.

"(2) The provisions of subsection (1) of this section shall not apply if, subsequent to the plea discussions or plea agreement, the defendant enters a plea of guilty or no contest which is not withdrawn."

Similarly, ORS 135.445 and OEC 410 restrict the admission of evidence concerning guilty pleas that are not accepted or are withdrawn.

referring to a "jury trial waiver" might suggest that plea negotiations had occurred in this case. For example, during the offer of proof, Dr. Janzer testified that defense counsel "presented [defendant] with questions and a discussion of the possible legal strategies * * * of the possible *advantage to [defendant] of agreeing to a trial without a jury so as to avoid the death penalty.*" (Emphasis added.) A fair interpretation of the highlighted phrase is that the state had agreed not to seek the death penalty if defendant would give up his right to a jury trial, *i.e.*, a plea bargain.

The trial court also concluded that "quasi plea offer" evidence might unfairly prejudice the state. During *voir dire*, some of the jurors advised the prosecutors that they thought that it was inappropriate to plea bargain, especially in cases involving serious crimes. The unfair prejudice is especially apparent in this case because, in fact, a plea offer was never extended to defendant.

Our examination of the record reveals that defense counsel questioned Dr. Janzer about the "substance of the discussion" that counsel had with defendant in Dr. Janzer's presence, and that Dr. Janzer was allowed to explain how that evidence supported his conclusion about defendant. The trial court's minimal sanitization of the evidence, to which defense counsel agreed (or at least to which defense counsel did not object), did not prevent defendant from questioning Dr. Janzer fully about his relevant observations. *See State v. Harberts*, 315 Or 408, 417-18, 848 P2d 1187 (1993) (redaction of inadmissible matters from proffered testimony may be permitted if the meaning of the remaining proffered testimony is not significantly altered).

The use by defense counsel of the words "jury trial waiver" during his questioning of Dr. Janzer might have communicated falsely to the jury that a plea offer had been extended to defendant when, in fact, no such plea offer had been made. For the foregoing reasons, we hold that the trial court did not improperly limit psychiatrist Janzer's testimony.

■ Defendant also claims that the trial judge erred in excluding Dr. Johannsen's testimony concerning whether defendant's behavior in declining to waive a jury trial to avoid

the death penalty was self-defeating. Defense counsel proposed to ask Dr. Johannsen the following question:

"If I told you further that it was not merely a hypothetical, but that that is, in fact, the case as indicated not only by court record but also by testimony which will be offered by Dr. Janzer who witnessed myself conducting an interview with [defendant] informing him of all the possible permutations and advising him that *he had no other realistic choice, but to waive the jury in order to avoid the death penalty or to eliminate the possibility of the death penalty,* * * * would your opinion be the same, that is, as it would be in the hypothetical?" (Emphasis added.)

For many of the reasons stated in our discussion of the previous assignment of error, we hold that the trial court did not err in excluding that evidence.

We have considered all of defendant's other assignments of error and every argument in support thereof. Those same assignments of error and arguments either have been addressed previously by this court and rejected or are not well taken. Discussion of them would not benefit the bench or bar. We find no error based on those assignments of error.

The judgment of conviction for aggravated murder and attempted aggravated murder is affirmed. The sentence of death is affirmed.

**FADELEY, J.,** dissenting.

Defendant in this death penalty case did not receive a fair trial because he was not permitted to prove his defense, even though the prosecutor produced similar but contrary evidence. Defendant's main line of defense, of which statutory notice was given through counsel appointed to represent him, was that the jury should return a verdict of guilty except for insanity. Defendant bears the burden of proof on that plea. ORS 161.305, 161.055(2). That verdict, if returned, would not permit a death penalty; in this armed-robbery homicide case, commitment to the custody of the Psychiatric Security Review Board (PSRB) for defendant's life would result. ORS 161.327(1).[1]

---

[1] The last sentence of ORS 161.327(1) provides: "The period of jurisdiction of the board shall be equal to the maximum sentence provided by statute for the crime

Defendant was prevented from bringing before the jury, in support of his plea, striking evidence supporting a finding of fact of mental illness. He was also prevented from bringing to the jury evidence about the length of mental hospital stay in the case of similar PSRB commitments, if the jury found that defendant was guilty except for insanity.

The homicide occurred while defendant was robbing a bank in his home town during regular daylight banking hours. He wore no disguise and made no attempt to conceal his identity. While driving his van to the bank to rob it, he saw and was seen near the bank by a police officer with whom he was well acquainted. Defendant saw and was seen by two acquaintances who were inside but leaving the bank as defendant entered to do the robbery. Defendant shot a teller who knew him and apparently shot at, but did not pursue, another teller who also knew him. He did not flee from the community after the robbery. Defendant was seen later that day driving his van and was stopped by a police officer who summoned additional police to the scene. After several requests for defendant to get out of the van, he did so, and then leaned against the side of the van standing motionless with his arms folded across his chest for two hours and 45 minutes. When the police finally charged toward defendant and arrested him, he did not struggle or resist being handcuffed. He had to be carried to the police vehicle for transport to jail. He did not communicate with the police in any way.

Because his muteness continued, a hearing was held on the issue of whether defendant was competent to aid and cooperate with his appointed defense counsel and, thus, whether he was competent to stand trial under ORS 161.360(2).[2] Two circuit judges who heard pre-trial matters in the case found defendant able to assist and cooperate in his

---

for which the person was found guilty except for insanity." In an aggravated murder case arising in 1990 that maximum sentence is natural or true life. ORS 163.105.

[2] ORS 161.360(2) in part provides:

"A defendant may be found incapacitated if, as a result of mental disease or defect, the defendant is unable:

"(a) To understand the nature of the proceedings against the defendant; or

"(b) To assist and cooperate with the counsel of the defendant; or

"(c) To participate in the defense * * *."

defense. As an integral part of that finding, they also found *as fact* that his non-speaking behavior was elective on his part, that is, that defendant could talk and assist or cooperate with his counsel if he wanted to do so, and, therefore, that defendant was in fact malingering when he remained mute. In this case, that fact question — malingering or mentally ill? — is much like the question that the law asks the jury, not the judge, to decide where the defense is guilty except for insanity.

Facts in the record relevant to the insanity defense include the following: Before the robbery, defendant had been admitted to the Oregon State Hospital for the mentally ill at least six times; defendant was admitted in December of 1988 and discharged in March of 1989, during which period psychologist Johannsen was among those who treated defendant; although he personally signed a diagnosis report of schizophrenia at that time, at trial he testified that he made no specific diagnosis at that time but noted that schizophrenia should not be ruled out. Psychiatrist Suckow treated defendant in March of 1989 at the state hospital and diagnosed defendant as a paranoid schizophrenic with a passive-aggressive personality. Psychiatrist McKenna, who treated defendant at the state hospital in 1983, had diagnosed defendant as suffering from chronic paranoid schizophrenia as did the psychiatrist in charge of defendant's treatment team in 1988-89. However, other treating specialists — psychologist Hulteng, and psychiatrist Wessert — believed that defendant suffered from a severe personality disorder rather than any category of schizophrenia.

Psychiatrist Janzer examined defendant in relation to the charge in this case near the time of trial. Janzer diagnosed defendant as having "schizophrenic reaction."

The theory of defense at trial to the jury was guilty except for insanity. Such a defense must be and was disclosed before trial. The prosecutor's countervailing theory was that defendant's bizarre conduct was prompted by self interest, not insanity, and was designed specifically to benefit defendant, that is, that defendant was merely putting on an act and, thus, was malingering.

The prosecutor started developing the malingering theory early in the jury trial process, asking questions on *voir dire* that directed the jurors' attention to that theory of the state. The state adduced evidence to the jury in support of its malingering theory throughout the trial. It was the centerpiece of the state's closing argument to the jury.

Although the state was freely permitted to produce evidence to support its malingering theory, rulings of the trial court repeatedly thwarted defense counsel's efforts to disprove that theory and to prove that the conduct was a product of defendant's psychosis instead. This pattern — repeatedly excluding evidence consistent with the insanity defense but repeatedly permitting evidence inconsistent with it — resulted in an unfair trial.

(1) Evidence Defendant Could or Would Not Speak to Save His Life.

Defense counsel was prevented from proving that defendant would not or could not speak even to save his own life. Whether it was "could not" or "would not" really doesn't change the impact of the offered but excluded expert testimony. That excluded evidence showed that defendant was not "acting out of self interest," thus strongly tending to disprove the keystone element of the state's malingering theory.

(a) *Psychiatrist Janzer*

Defendant's first assignment of error on this point states:

"The trial court erred in limiting defense counsel's direct examination of psychiatrist Janzer."

His summary argument on that assignment contends:

"The trial court refused to allow an expert psychiatrist called by the defense to testify about his observations of defendant's interactions with defense counsel when defense counsel attempted to get defendant to sign a jury waiver. The court excluded all mention of the proposed jury waiver. That exclusion was improper and denied defendant his right to present relevant evidence concerning his mental state. The psychiatrist based his diagnosis *in part* on the interaction between defendant and defense counsel. The witness should

have been allowed to fully describe that interaction." (Emphasis added.)

Defense counsel sought to have defendant waive a jury trial on the basis that, in a trial before a judge, the death penalty would not be an available penalty. Waiving a jury, if agreed to by defendant and the court, assuming the state also agreed, thus would save defendant's life. On one occasion, where counsel pointed out that fact to defendant, an expert psychiatrist was present, but when counsel explained to defendant how waiver of the jury trial would avoid the death penalty, defendant still remained mute. Likewise, when counsel in court tried to waive a jury on behalf of defendant and the court asked whether defendant consented, defendant did not respond to the court's question but, instead, remained mute. Waiver of jury trial, therefore, was not a possibility, *i.e.*, avoiding death by that avenue was not possible because of defendant's muteness. This episode was one of the reasons that psychiatrist Janzer opined that defendant was not malingering, was not feigning muteness in his own self interest, and was, instead, mentally ill in a schizophrenic reaction. But the doctor was not permitted to testify meaningfully about the episode, or the lack of self-interest motivation it demonstrated, *or the basis for his diagnosis* of mental illness that it provided.

After the court sustained the state's objection to testimony about the incident, defense counsel then made an offer of proof. The court and defense counsel discussed further refinements in the wording of questions to be put to the expert. Defense counsel expressly acknowledged that he was satisfied with sanitizing the evidence *in accordance* with his offer, which retained direct mention of counsel's request that defendant waive a jury trial as a means of avoiding the death penalty. Colloquy concerning that offer follows:

"THE COURT: Perhaps if it's couched in terms of the discussion with you simply telling your client that there were — what the various options were and that there was a possibility that he could minimize the chances of having to deal with the death penalty, that certain trial strategies were used or things of that nature, and not getting a response — you know, it may be a little bit vague, but, on the other hand, it still gets the message across.

"[DEFENSE COUNSEL]: I can make it *more unilateral* in nature so it's merely *our decision and the prosecutor's office has nothing to do with it.*

"THE COURT: Exactly.

"[DEFENSE COUNSEL]: Fine." (Emphasis added.)

The prosecutor nonetheless, then objected to the admission of the evidence and requested a clarification of the court's ruling.

The court then instructed defense counsel to make an offer of proof on the evidence, sanitized in the manner and to the degree that defense counsel intended to present it to the jury. Defendant's offer of proof follows:

## WHAT THE JURY DID NOT HEAR[3]

"A. It was approximately an hour and ten minutes [that Dr. Janzer and defendant were together] before we were joined by [defense counsel].

"Q. If you can, relate for the Judge what occurred in terms of my entry into the office, how [defendant] responded to my entrance, what questions I asked him, and specifically did [defendant] and I — or did I discuss with [defendant] the possible strategies for going to trial and what [defendant's] responses were to my advice.

"A. Until [defense counsel] came into the office, [defendant] had the same stance he has now, eyes closed, looking straight ahead apparently, never responding verbally or by any kind of gesture to anything that I was saying, proposing, or questioning him about.

"When [defense counsel] entered the office, there seemed to be a brief look of recognition on the part of [defendant], and then he went back into this stance with eyes closed.

"*[Defense counsel] then presented him with questions and a discussion of the possible legal strategies — one of* which I had been prepared for by [defense counsel], and I had tried to get into that, too — *of the possible advantage to [defendant] of agreeing to a trial without a jury so as to avoid the death penalty.*

---

[3] Because the trial court directed the defense to use different and more general and abstract words than those in its offer, the jury never heard one basis for the doctor's diagnosis or the facts that support it. What they did hear will be reproduced later in this opinion.

"I got no response when I did this alone with him. Then [defense counsel] attempted to do that in more detail than I did, of course. Again, *there was absolutely no response on [defendant's] part.* It was almost difficult to know if he was even hearing what [defense counsel] was saying.

"Then [defense counsel] suggested to him the possibility that [defendant] may be viewing this as a way of committing suicide, having the State do it for him. That got no response. [Defense counsel] then exercised his imagination and tried to provoke, I believe, [defendant] into some kind of a reaction by saying — asking him what he would do if he could just walk out of my office a free man; it was a beautiful day out there, things of that order. No response to that either.

"So I was left with the net impression that [defendant] wasn't approachable, wasn't — one couldn't communicate with him on any kind of a topic at that particular time, and —

"Q.    In terms of how that might apply to the diagnostic criteria for schizophrenia, what specific examples in that case would you pick out as being indicative of specific criteria under the DSM-III-R for catatonic schizophrenia?

"A.    Well, the continued muteness. First of all, I was persuaded, based upon that behavior I observed as he entered my office and again after he left — as he was leaving my office, that there is some contact with reality. He does hear. If he opens his eyes, he does see, so that there is at least a basic relationship to reality. So it wasn't that he wasn't hearing or taking in what either myself or [defense counsel] was saying to him. It was — and this would fit in with the schizophrenic state of mind — that the way that he was processing that information just does not make sense from a — from an ordinary, rational point of view — the idea of being up against the death penalty — and I have had considerable experience with defendants in this position — just — it was like he was incapable of conceiving of what effect this would have upon his life.

"So this inability to think rationally, to solve a problem, as it were, to utilize other people in helping himself either to commit suicide, if he wanted to, or to escape the death penalty — it — he just doesn't process it in a normal fashion, and that would fit in with the thinking disturbance in schizophrenia. Certainly his lack of emotional response to such a — what would, for most of us, be a dreaded experience, contemplating one's own death — just flatness — that fits in with the schizophrenia, and his inability to utilize people or relate to

people — that's one of the hallmarks of schizophrenia. The inappropriateness of his behavior — that's schizophrenic. It could be a number of other things, as well, but the term 'schizophrenic' best pulls all of these elements together into a single diagnosis.

"Q. Doctor, are you familiar with the diagnosis of 'malingering,' as defined in the DSM-III-R?

"A. Yes.

"Q. In layman's terms what does 'malingering' mean, in general?

"A. Well, in everyday terms, it's putting on an act to gain some personal goals. The malingering that one sees occasionally in the Workers' Compensation case — if someone insists they are permanently damaged by some accident and then after they leave the examination scene they move around quite normally — I have had that happen a couple of times.

"There are — in the case of [defendant], the reason I am quite convinced that this is not putting on an act just for the sake of the current legal predicament is because there is a number of — there are a number of witnesses who have known [defendant] a long time, over years, who can report the same kind of behavior before he was in any kind of a legal predicament, where it would be impossible for us ordinary people to see any individual — any personal advantage to [defendant] for acting this way. Whereas, with the malingerer, you can understand why they would want to be accepted with this or that diagnosis. There is some practical, personal advantage to it. In this case, it's senseless.

"Q. In the case of my interview with [defendant] that you witnessed, [defendant's] either passive refusal or nonresponsiveness to my advice that he proceed to trial without a jury so that he would avoid the potential of the death penalty being imposed — how does that fit into this finding by you of not malingering, ruling out malingering?

"A. Because it seems like an extension of a pattern that's well recognized over the years. Whenever he is in a confrontational situation with another person — even if it be in terms of getting employment or maintaining employment or getting food or coming in out of the cold and maybe preserving his life — he just responds in the same set, stereotype, routine, ritualistic way.

"Q. Do you view his nonresponsiveness to my advice as being something that would be to his advantage or to his disadvantage from an objective standpoint?

"A. Well, objectively and without the benefit of knowing what's going on between his two ears at this time, *I just don't see any advantage to him.* * * *

"[DEFENSE COUNSEL]: That essentially is the sum and substance of that area, Your Honor, that I would go into." (Emphasis added.)

After the prosecutor had cross-examined the witness Janzer as part of the defense's offer of proof, defense counsel inquired:

"[DEFENSE COUNSEL]: Your Honor, I take it that the Court's ruling still stands, that I can get into the area as sanitized?"

The court responded negatively as follows:

"THE COURT: Actually, I have got a secretary typing up a *more sanitized* phrase here.

"[To the clerk]: Give *one to the doctor,* one to [the prosecutor], and one to [defense counsel].

"*In lieu of jury trial waiver, this is the phrase that the Court directs you to use in terms of sanitizing this testimony, and for the record it is: 'Trial strategies that require his' — meaning the defendant's — 'consent which would substantially minimize his potential exposure to the death penalty,' and that's it.*

"[DEFENSE COUNSEL]: I understand." (Emphasis added.)

## WHAT THE JURY HEARD

Using the trial court's sterilizing redaction question, only the following testimony was heard by the jury:

"Q. Specifically in my questioning him, did I discuss with him trial strategies that required his consent which would substantially minimize his potential exposure to the death penalty?[4]

---

[4] Defense counsel had presented defendant with a plan that would have prevented the death penalty, if accepted, not one that would merely "minimize his potential exposure" to it. The difference in jury impact is huge.

"[PROSECUTOR]: Objection, Your Honor. The content of conversations is not relevant to anything.

"THE COURT: Overruled.

"THE WITNESS: Yes, you did.

"Q. (By [Defense Counsel]) What was his response to my questions along that line of reasoning?

"A. No response.

"* * * * *

"Q. * * * With regards to my addressing to him questions and advice regarding trial strategies that required his consent which would substantially minimize his potential exposure to the death penalty and his lack of response to those questions and that advice, does that fit into your diagnosis of schizophrenia in [defendant] and, if so, how? I'd like your opinion on that.

"A. Uhm —

"Q. Without discussing any further the conversations that I had with him other than that.

"A. It — I took it to mean that his appreciation of reality was quite impaired, that he didn't really understand the predicament he was caught up in."

Redaction (sanitizing) of a witness' proposed testimony before it finally is presented to the trier of fact may be permitted *where* that may be and *is done* "without significantly altering the meaning of the original statement in the context in which it was made." *State v. Harberts*, 315 Or 408, 417, 848 P2d 1187 (1993). *Harberts* remanded a witness' statement to the trial court to make specific determinations about whether the statement could be redacted to preserve its meaning while avoiding the potentially offensive material that was part of the statement's context. Here the trial court did nothing on the record to show that it performed the evaluative steps prescribed in *Harberts* or that he was concerned with preserving the meaningfulness of the statement.

The trial court's exclusion of the context that gave the offered testimony its strong evidentiary value — without indicating why that context had to also be excluded — also seems to fly in the face of this court's decision in *Fromdahl and Fromdahl*, 314 Or 496, 840 P2d 683 (1992). In *Fromdahl*, this court ruled that, where the evidence was offered to

show a party's mental state or reaction, it was error to exclude testimony about the fact that a polygraph test was taken and, moreover, about the contents of a report of that test in order to show the witness' mental state or reaction to being advised of such report. *Id.* at 508-09. This court remanded "for a reexamination of the [main] issue [in the case] in the light of the whole record, including mother's evidence that the court erroneously excluded." *Id.* at 510. This court also held in *Fromdahl* that evidence offered to show a party's state of mind circumstantially was not excludable on hearsay grounds and that exclusion was error. *Id.* at 508-09.

Applying *Harberts* to this case discloses trial error that requires a remand to the trial court to reconsider its decision concerning redaction, in light of the rule in *Harberts*. Applying *Fromdahl* requires remand to the trial court to make its decision concerning exclusion of the unredacted testimony on the speak-to-save-your-life issue pursuant to the law announced in *Fromdahl*. Applying both *Harberts* and *Fromdahl* makes mandatory reversal of this case and remand for a new trial wherein admission of the excluded evidence, evidence that goes to the heart of defendant's theory of defense is, newly and properly considered.

The trial court applied to the offered testimony changes (or redactions) that sterilized the testimony, not sanitized it. In so doing, the court apparently relied on an analogy to the rule, based on policy, that excludes offers of compromise in a civil case, but went far beyond excluding any foundation for an inference that the state had offered defendant less than death. The offer of proof, quoted above under the heading "What The Jury Did Not Hear," does not suggest that the state offered or might offer such a deal. The trial court's policy reason, relied on by the majority (319 Or at 46) does not apply to the offer made, as quoted above.[5]

There is a significant difference between "this specific idea will save your life if you consent" and "these trial

---

[5] The majority bases its decision on this assignment of error on two grounds. The sanitization of the evidence was "minimal," 319 Or at 46, and that defendant questioned Dr. Janzer "fully." *Ibid.* Comparing the items quoted above under the heading "What the Jury Heard" with that quoted under "What the Jury Did Not Hear" will, I think, convince most readers that Janzer did not testify "fully" and that the sterilization of his testimony was more than "minimal."

strategies will substantially minimize your potential exposure to the death penalty, let's talk about them." The impact of meaning of the first is nearly lost in the second version. The trial court had no authority to change the meaning to that extent, nor was there any need to do so. The offer of proof did not imply any plea bargain or "compromise" negotiations.

The trial court erred plainly on the face of the record to defendant's prejudice by sterilizing the testimony. The expert witness apparently was not able to communicate completely or effectively under the trial court's reconstruction of the reality that defendant could not or would not speak to save his life. The sterilized phrasing was not the basis for his diagnosis which he was prevented from telling to the jury.

This of course, also forced the expert into agreement with the trial court's competency ruling, although his actual opinion was to the contrary. Moreover, the sterilized testimony, gave no hint of defendant's inability to speak to save his life. It only disclosed an unwillingness to discuss some abstract "strategy" to "minimize a potential exposure."

The trial court's rulings to exclude evidence also had the effect of forcing the jury into agreement — for lack of information to conclude otherwise — with the court's earlier competency rulings. And, the rulings greatly reduced the impact of the expert's opinion that defendant suffered from mental illness.

The rulings invaded the province of the jury and deprived defendant of his defense. Reversal is appropriate for the erroneous exclusion.

(b) *Psychologist Johannsen*

Defense counsel had attempted to question a second mental health professional, one whose testimony generally favored the state, about whether defendant's muteness in the conference relating to the request that he consent to waive jury trial in order to save his life was contrary to the state's malingering theory. The trial court ruled to prevent defense counsel from presenting the won't-talk-to-save-his-life evidence to disprove the malingering theory, and did so after an offer of proof was taken.

Defendant's assignment of error concerning this second mental health professional is:

"The trial court erred, during defense counsel's examination of psychologist Johannsen in the guilt phase, in sustaining the state's objections to * * * questions concerning the witness' opinion about defendant's behavior in declining to accept a jury trial waiver in exchange for the elimination of the possibility of a death sentence."

The summary argument on that assignment of error was:

"The trial court also refused to allow defense counsel to question the psychologist about his opinion of defendant's behavior in declining to accept a jury waiver in exchange for the elimination of the possibility of a death sentence. The jury waiver issue was relevant to the psychologist's conclusions concerning defendant. Defendant should have been allowed to ask questions in the area *to rebut the state's implications on cross-examination* that defendant was malingering and voluntarily remaining mute." (Emphasis added.)

Before the trial court excluded the offered opinion, the prosecution had already proved in the presence of the jury, by questions of the second professional, as follows:

"Q. [BY PROSECUTOR] You were also asked some questions about your statement that from your viewpoint this was self-defeating behavior.

"A. [BY PSYCHOLOGIST JOHANNSEN] Uh-huh.

"Q. That doesn't necessarily mean it was self-defeating for [defendant] from his personal viewpoint?

"A. It's conceivable that he may have seen it as an advantage to him, to not have to deal with the legal questions or the diagnostic questions.

"Q. And, as a practical matter, if one wanted to take a perfectly rational human viewpoint, although it might not be every one, having been found not able to aid and assist might be of tremendous benefit, might it not, if that might result in nothing happening?[6]

"A. That would be an example of malingering and avoiding prosecution which would certainly, I think, to the normal person be thought of as an advantage."

---

[6] As can be seen, the jury was made aware, by the prosecutor's comments, of the judge's ruling that defendant was competent to stand trial.

Excluding that witness' opinion that defendant's conduct was not to his advantage after permitting the prosecutor the foregoing, was prejudicial error.[7]

(2) *Evidence of Probable Length of Hospital Commitment If Found Guilty Except For Insanity.*

Regarding the excluded evidence of probable length of custody in a mental institution if the jury found defendant guilty except for insanity, defendant assigned as error:

"The trial court erred, during defense counsel's examination of psychologist Johannsen in the guilt phase, in sustaining the state's objections to (1) questions concerning the amount of time defendant would likely spend in the state hospital if he was found guilty but insane * * *[.]"

Defendant's summary argument on this assignment was:

"Defendant should have been allowed to question a psychologist concerning the amount of time he would likely spend in the state hospital if he was found guilty but insane. The state opened the door to the testimony by questioning the psychologist on cross-examination about the fact that defendant could be released at any time from the state hospital. Defense counsel should have been allowed on redirect-examination to elicit the testimony about how long defendant would likely spend *in the hospital* to clarify the issue raised by the state on cross-examination."

The state brought before the jury the following testimony:

"Q.  And you look at it in hearings such as this that it might be — although it wouldn't be everyone's choice — there might be a tremendous value in being found guilty but insane and might have the opportunity to be released from custody in a relatively short period of time rather than 30 years to life; that could be an advantage, couldn't it?

"A.  Less so these days than it was at one time. Actually, currently someone is more likely to be released from prison before they are released from the hospital setting.

---

[7] The Supreme Court of the United States has, on various occasions, prohibited a state from using the technical evidence rules to prevent the defendant from proving his or her theory of defense in a capital case. *Chambers v. Mississippi,* 410 US 297, 93 S Ct 1038, 35 L Ed 2d 297 (1973); *Rock v. Arkansas,* 483 US 44, 107 S Ct 2704, 97 L Ed 2d 37 (1987).

"Q. Is that necessarily true where there is a 30[-]year set on aggravated murder? The law does not provide for that, does it?

"A. I'm sorry.

"Q. The law does not provide for a guaranteed 30 years as the criminal statute would, does it?

"A. Thirty years in the hospital?

"Q. Right.

"A. Yes — no. The Psychiatric Security Review Board is authorized to approve some release into the community and that can occur at the P.S.R.B.'s discretion.

"Q. It just depends, but from the standpoint of someone who's kind of behind the eightball, they can perceive that to be an advantage and maybe that's not an irrational viewpoint?"

Following this testimony, defendant sought to ask the expert witness[8] about the probable length of stay at the hospital if defendant was found guilty of aggravated murder except for insanity. The court sustained the prosecutor's objection based on "speculation." In view of what the prosecutor had just been permitted to ask the witness, in the jury's presence, refusal to permit the defendant's question only increased the degree of speculation about the outcome should the jury find defendant guilty except for insanity.

Since 1984, the American Bar Association Criminal Justice Mental Health Standards have advocated that juries be given more information in insanity plea cases about the *effect* of a jury finding of insanity. Rorie Sherman, *Insanity Defense: A New Challenge*, Nat'l L. J., Mar. 28, 1994, at AI, A24. The reason to give a jury more accurate information is that, absent that correct information, the jury fills in the gap (or speculates) by substituting its members own common beliefs on the subject. Research indicates that this common belief is that sustaining the insanity plea means that the miscreant will be free and on the street quite soon, a belief contrary to and not in agreement with the reality of the

---

[8] Other testimony had established that defendant had worked at the forensic mental health unit of the hospital for many years and was the unit manager for a substantial time. This was the same hospital that defendant would have been committed to if found insane.

matter. Eric Silver *et al*, *Demythologizing Inaccurate Perceptions of the Insanity Defense*, 18 J. L. & Hum. Behav. 63, 65 (Feb 1994). Indeed, this issue — of giving accurate information to the jury in insanity plea cases — is presently before the United States Supreme Court in *Shannon v. United States*, 92-8346 (pending for argument at this writing). In that case, the appellant claims that jurors' fears about quick release to the street make them reluctant to vote "not guilty by reason of insanity," even when they think that verdict is warranted. Sherman, *supra*, at A24.

Of course, that situation is exacerbated in a state like Oregon that has tightened the defense to one of "guilty except for insanity," a change that has not yet permeated our society's understanding of the effect on the defendant's confinement.

Whichever way the Supreme Court decides the federal court case, *Shannon v. United States, supra*, the issue in Oregon should be whether we permit juries to decide the insanity defense or, instead, wish the trial court to decide both facts and law concerning that defense. The statutes require that the jury decide. The state constitution also commits this plea to the jury. Or Const, Art I, § 11.

The trial court's instructions to the jury exacerbated the effect of its restrictive rulings on evidence, an effect that invited speculation about the effect of an insanity verdict. Those instructions exacerbate the error, and violate the purpose of ORS 161.313. Those instructions in part were that:

> "If the defendant is found guilty except for insanity, the defendant is subject to the following dispositions by the Court: If the Court determines that the defendant is presently affected by a mental disease or defect and presents a substantial danger to others requiring commitment to a state mental hospital, the Court will order the defendant placed under the jurisdiction of the Psychiatric Security Review Board and order the defendant committed to a state mental hospital *pending further disposition by the Psychiatric Security Review Board*.
>
> "* * * * *
>
> "After the Court places the defendant under the jurisdiction of the Psychiatric Security Review Board, the board will have jurisdiction over the defendant for a length of time

equal to the maximum period of incarceration to which the defendant could have been sentenced had the defendant been found guilty of the charged crime.[9]

"If the board determines that the defendant continues to be affected by mental disease or defect and presents a substantial danger to others and is not a proper subject for conditional release, the board will order the defendant committed to a state mental hospital for custody, care, and treatment.

"The Psychiatric Security Review Board will order that the defendant be discharged from its jurisdiction *if at its first hearing or at some later date the board determines that either* the defendant is no longer affected by mental disease or defect or the defendant is still affected by mental disease or defect but no longer presents a substantial danger to others.

"* * * [On some conditions], the board will order the defendant to be conditionally released.

"A defendant who is conditionally released is subject to such supervisory orders of the board as are in the best interests of justice, the protection of society, and the welfare of the person.

"A person is considered to have a mental disease or defect requiring supervision even when that disease or defect is in a state of remission when the disease may, with reasonable medical probability, occasionally become active and render the person a danger to others." (Emphasis added.)

Telling the jury in the abstract that defendant could be released by the PSRB very shortly after the judge sent him to the mental hospital was highly prejudicial error because there was no testimony relating to the instruction for the jury to use in evaluating it in view of the court's prior exclusionary rulings, and because the abstract instruction implies quick release, complete or conditional. The error was compounded by the fact that, here again, the prosecutor's evidence of a short or uncertain length of stay was admitted but defendant's counter evidence was excluded.

## CONCLUSION

I would reverse and remand so that defendant can be accorded a fair trial on his insanity defense. This society does

---

[9] It is noteworthy that the trial court did not say how long that was potentially, *i.e.*, the court did not relate the instruction to the jury's case.

not execute the insane. Defendant is entitled to a fair trial on that issue.

The majority seeks to allay the concerns for executing the insane in this case by relying on the findings of the trial judge (not the jury) that defendant was mentally competent to stand trial. Among the judge's factfindings displayed by the majority are ones about defendant's ability to communicate in writing. In the context in which those findings are quoted, it appears that defendant communicated in writing about his defense of the present charge. That implied context misleads. No such written communication occurred. What the trial judge referred to, for example, were written communications while defendant was in the mental hospital years ago. They only serve to prove the efficacy of psychoactive pharmacologic agents administered at the hospital, not defendant's mental state much later at the time of the homicide in this case.

The majority also relies on the defense counsel's failure to observe all evidentiary rules when attempting to present the excluded evidence that was the heart of his affirmative defense. I don't think the government should execute a defendant for the technical inadequacies of his lawyer, selected and appointed by the same government.