Submitted on record and briefs June 1, 2001, affirmed October 23, 2002

# STATE OF OREGON,
*Respondent,*

*v.*

# ROBERT CARMELO TORRE,
*Appellant.*

## 97CR1615; A105871

56 P3d 473

Robert Carmelo Torre filed the briefs *pro se.*

Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Robert B. Rocklin, Assistant Attorney General, filed the brief for respondent.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

DEITS, C. J.

**DEITS, C. J.**

Defendant appeals from a judgment of conviction for criminal mischief in the third degree, ORS 164.345,[1] and criminal trespass in the first degree, ORS 164.255.[2] We affirm.

The district attorney's information charged defendant with criminal mischief in the third degree and criminal trespass in the first degree. The charges were based on a dispute between defendant and the victims, his neighbors. At trial, defendant testified that the victims' dog defecated on his property and that he ultimately threw fecal matter into the victims' home.[3] A jury convicted defendant of both counts. Judge Gillespie signed a judgment of conviction.

Following the entry of judgment, defendant appealed. Thereafter, the parties moved to vacate the judgment of conviction because of allegations that the audio record in the case did not accurately reflect the trial proceedings. We issued an appellate judgment that vacated the judgment of conviction and remanded the case to the trial court for further proceedings. *See* ORS 138.227.[4]

---

[1] ORS 164.345 provides, in part:

"(1) A person commits the crime of criminal mischief in the third degree if, with intent to cause substantial inconvenience to the owner or to another person, and having no right to do so nor reasonable ground to believe that the person has such right, the person tampers or interferes with property of another."

[2] ORS 164.255 provides, in part:

"(1) A person commits the crime of criminal trespass in the first degree if the person:

"(a) Enters or remains unlawfully in a dwelling[.]"

Although ORS 164.255 was amended after defendant committed his crimes, we refer to the current version of the statute because the quoted language was not changed.

[3] We note that, even though defendant testified that the fecal matter was produced by the victims' dog, the investigating officer testified, in part, that the feces appeared to be feline in origin.

[4] ORS 138.227 provides:

"(1) Upon joint motion of the parties to an appeal in a criminal action, the court may vacate the judgment or order from which the appeal was taken and remand the matter to the trial court to reconsider the judgment or order, or any order entered by the trial court. Upon remand, the trial court shall have jurisdiction to enter a revised judgment or order.

On remand, defendant filed motions to postpone the scheduled hearing and to allow scientific forensic examination and analysis of the master tape recordings of the trial "for the purpose of having said expert forensically analyze said tapes and make a determination of whether said taped record has been modified, damaged, tampered with, or in any other way altered from their original condition, to aid in settling the record in this matter." Thereafter, the state filed a motion to settle the record, arguing, in part:

> "[T]his [c]ourt should first determine whether there is a basis to find that the master recording made at trial in this matter is accurate. A determination that the record is accurate can be accomplished through the testimony of the trial court recorder and without resort to expensive and time consuming forensic analysis. Should this [c]ourt determine that there exists a basis from which to conclude that the master recording should be analyzed forensically, it may so order."

Judge Barron presided over the hearing to settle the record (the hearing). At the hearing, Judge Barron indicated that "it sounds to me as if nothing happened more than these are recording defects that possibly rarely happen but still can happen." In other words, Judge Barron reasoned that defendant, the proponent of the position that the master tape had been altered, had not persuaded him of that fact. Judge Barron also concluded that, even if someone intentionally altered the tape, defendant had not demonstrated that he was prejudiced. Ultimately, Judge Barron issued an order reinstating the judgment of conviction, settling the trial record to "consist of the transcript of proceedings and an amendment thereto," and denying defendant's motion to allow forensic examination and analysis of the tapes.

Defendant appealed Judge Barron's order reinstating the judgment. However, we issued an order that stated, in part:

> "The question arises whether the order on remand is appealable. Although ORS 138.227 permits a new appeal to

---

"(2) After entry of a modified judgment or order on reconsideration, or upon reentry of the original judgment or order, either party may appeal in the same time and manner as an appeal from the original judgment or order."

be taken from entry of a modified judgment or upon reentry of the original judgment from which the appeal was taken, the trial court has not entered a modified judgment nor has it reentered the original judgment. The court determines that merely ordering reinstatement of the original judgment is insufficient to give rise to an appealable decision.

"The court further determines that the trial court intended to enter an enforceable and appealable judgment. Therefore, pursuant to ORS 19.270(4), the court gives the trial court leave on motion of either party to enter a modified judgment or to reenter the original judgment."

Thereafter, the original judgment of conviction was re-entered. Consequently, we turn to defendant's appeal.

Before addressing defendant's specific assignments of error, we must determine our standard of review of findings of fact in a proceeding to determine the accuracy of a trial court record and our standard of review of the trial court's ruling in such a proceeding. *State v. Lee Ping Bow*, 10 Or 27 (1881), is instructive. In that case, the defendant was convicted of larceny. On appeal, he asserted that the trial court erred in denying his motion to correct the record of his arraignment. The defendant's motion to correct was based on affidavits indicating that he "did not understand the English language sufficiently to comprehend the proceedings, and that no interpreter was sworn, neither were the proceedings interpreted or explained to him, at the time of his arraignment." *Id.* at 29. However, counteraffidavits were also filed. Those affidavits indicated that the defendant "did sufficiently understand the English language" and that no interpretation was necessary. *Id.* In explaining its decision, the Supreme Court reasoned:

"As the amendment of its record was a matter resting in the sound discretion of the court below, we have no power to review its determinations made in the exercise of that discretion, unless they disclose errors of law. In this instance the evidence furnished by the affidavits was conflicting, and we are by no means satisfied that the decision complained of was against the weight of the evidence.

"The bill of exceptions shows that the court below found that the appellant did possess some knowledge of the English language, and we must presume it considered his

knowledge sufficient to enable him to understand the proceedings as they transpired, and that he did, in fact, sufficiently understand them to avail himself of all the benefits which the statute was designed to confer upon him for his protection in making his defense. Taking into account also the facts disclosed by the record, that he appeared by counsel, as well as in person, at every stage of the proceedings previous to his conviction, and that no objection or suggestion of this nature was interposed until after he had been tried and found guilty by the jury, and we cannot doubt the justice or correctness of the ruling denying the motion."

*Id.* at 29-30.

■ The reasoning in *Lee Ping Bow* indicates that an appellate court will review the trial court's ruling concerning the accuracy of a record for abuse of discretion and that, where a motion is filed to settle the record and conflicting evidence is presented, a trial court's findings are binding on appeal if there is evidence to support them. That standard of review of factual issues is also consistent with the standard that the Supreme Court articulated in *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968):

"What actually transpired is a question of fact for the trial court or jury. If the evidence sustains such historical factual findings they will not be disturbed by this court. If findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion[.]"

The Supreme Court has applied that standard in reviewing findings of fact that form the basis of various trial court rulings in a criminal prosecution. For example, in *State v. McDonnell*, 313 Or 478, 484, 837 P2d 941 (1992), the defendant asserted "that the trial court erred on remand in denying his motion to require the district attorney to offer him an opportunity to plead to the charge of aggravated murder and to receive a life sentence" under the pertinent statute. In reviewing the facts found by the trial court during the evidentiary hearing that was held on remand, the Supreme Court determined that, under *Ball*, the trial court's findings were supported by evidence in the record. In *State v. Farrar*, 309

Or 132, 786 P2d 161, *cert den*, 498 US 879 (1990), the defendant asserted that an officer forged the signatures on the copy of a search warrant that he gave to the defendant. The Supreme Court stated that "[t]he trial court heard defendant's repeated claims on this issue and found them to be factually meritless by upholding the validity and sufficiency of the warrants." *Farrar*, 309 Or at 147. Relying on *Ball*, the court reasoned that the "trial court's findings are supported by the record and its conclusion that service of a conformed copy on defendant was adequate was not erroneous." *Farrar*, 309 Or at 147. Thus, we conclude that we are bound by the trial court's findings of fact if there is evidence to support them and that we will review the trial court's ultimate decision to settle the record for abuse of discretion. With those standards of review in mind, we turn to defendant's assignments of error.

Defendant raises nine assignments of error and makes numerous arguments in support of those assignments. To the extent that defendant's assignments of error and arguments concern errors that occurred during the hearing, the underlying premise of those assignments and arguments is that Judge Barron erred by failing to find that the master tape of defendant's trial had been altered. Because the resolution of that issue could dispose of those of defendant's assignments of error and arguments that relate to the hearing, we address it first.

Defendant presented evidence that the master tape of his trial had been altered in three general locations.[5] The first alleged alteration involves the following portion of defendant's trial testimony:

"[DEFENSE COUNSEL]. Okay. Have there been other occasions that you have seen the dog in your yard and leave piles when he wasn't attended by the Brickeys?

"[DEFENDANT]. Uh, well, the dog—before the Brickeys lied to the police and had me arrested they would never use the leash.

---

[5] In order to describe the alleged alterations, we quote the relevant portions of the trial transcript and use them to explain defendant's allegations.

"[DISTRICT ATTORNEY]: Objection, Your Honor. I ask that - - -

"[JUDGE GILLESPIE]: (Interposing) Sustained. That's not appropriate, [defense counsel].

"[DEFENSE COUNSEL]: Right.

"[JUDGE GILLESPIE]: Ask specific questions. And you answer them, sir. Do you understand?

"[DEFENDANT]: Yes."[6]

At the hearing, defendant testified that he had attended his trial, had listened to copies of audio tapes of the trial, and had determined that the tapes did not reflect what had occurred at trial. Specifically, defendant testified that (1) at trial, Judge Gillespie, rather than the district attorney, objected and (2) when he listened to a copy of the tape, the judge was not "yelling anymore, he's just talking normally." Defendant introduced into evidence the report of Kenneth Kareta, the owner of Key Audio & Entertainment Services. With regard to the objection, the report indicates, in part:

"In this obvious edit, there is a 3rd Bias Voltage, indicating a 3rd tape machine was utilized during this part of the tape. The Original Bias trace, sways slightly during the edit, indicating that this edit had taken place prior to any standard cassettes being duplicated from the original 4-track master tape.

"The initial pulse of Bias 3, begins during [defendant's] words 'The Brickeys' * * * on the transcript[ ] and ends ½ of a second thereafter, * * * on the word 'arrested['.]"

The second alleged alteration involves a portion of Judge Gillespie's instructions to the jury:[7]

"You will have with you those instructions together with, I believe, four exhibits that were received in evidence and a verdict form. It has the case caption, its title and all that, and then it says, 'We, the jury, being duly empaneled to try the issues of the above-entitled case, all six of our number concurring, find the Defendant *Robert* Carmelo Torre,' either *on* each charge *guilty or guilty*. You deliberate each

---

[6] For convenience we refer to the quoted passage as "the objection."

[7] For convenience, we refer to the quoted passage as the "jury instruction."

verdict separately. When all six of you agree as to an outcome—doesn't matter whether you all six agree the outcome is not guilty or you all six agree the outcome is guilty, you've reached a verdict. When that's done, then it should be signed and dated—today is November 25th, I believe, according to my watch, and it requires the[ ] presiding juror's signature only."

(Emphasis added.) At the hearing, defendant indicated that (1) Judge Gillespie's "demeanor during the whole trial was he wanted me to be convicted of the charges"; (2) after Judge Gillespie said "guilty or guilty," he did not remember the judge using the words "guilty or not guilty" in the remainder of his instructions; and (3) with regard to the tape, "after [the judge] said that 'guilty or guilty,' there's that click and the background change, and he sounds like his voice is speeded up a little. And then that the speed change seems to calm down but it does sound like it has been edited."

At the hearing, Russell Gorsline, a recording engineer and studio manager who analyzed copies of tapes from defendant's trial, testified. Gorsline is a member of the Audio Engineering Society Subgroup on Forensic Audio, but he has received no formal training. Gorsline testified that defendant supplied him with two tapes and asked Gorsline to analyze them, focusing on the jury instruction. After capturing the pertinent sections of both tapes in the computer as digital sound files and listening to the files as well as examining the files' wave forms, Gorsline found identical anomalies on both tapes. He concluded that, "because the same exact occurrence happens on both tapes at exactly the same time, the only way that could happen is if it were in the master from which it [was] copied." In his testimony Gorsline emphasized that "[s]omething has happened to the master" and indicated that the master was altered. Gorsline describes the various anomalies in his report, which states, in part:

> "[T]here are anomalies in the recording in the word 'Robert,' between the words 'either' and 'or,' and in the transition between the words 'charge' and 'guilty.' Further, starting with the word 'on' there is a difference in the frequency response in the recording. None of these would be found in a normal recording. Something abnormal happened at each of these locations.

"* * * * *

"* * * [The graphic]`shows the 'hit' that happens between the words 'either' and 'on.' The audio wave pattern shown here is a very common electrical pattern that occurs when cassette recorders are stopped and started in the record mode. This pattern would not happen in any normal continuous recording situation in a courtroom.

"The next instance of a hit is found in the transition between the words 'charge' and 'guilty.' This is shown in a [graphic].

"* * * The pattern in the [graphic] is indicative of an edit that punches over the top of existing information without stopping the master recorder. Not only can a click be heard in the recording at this point, in this edit the judge is not allowed to finish the word 'charge.' The g and e are virtually non existent in this recording. This is in contrast with the generally good diction of the judge, also indicating an edit.

"Not as identifiable in graphic form are further instances of tampering. The first is in the words just preceding the above examples in the word 'Robert.' A click can be heard in the transition of the first two syllables, and a speed change occurs also. This type of sound occurs when recorders are being stopped or started. For example, while a constant tone is playing and a recorder moves from normal speed to a stop or from a stop to normal speed, the tape is not moving at a constant speed. It is decelerating or accelerating.[8] However, the sound reaching the tape is at a constant speed. When the recording is played back across the speed transition it is moving at a constant speed and plays back the tone with an apparent swoop. * * *

"* * * * *

---

[8] Gorsline clarified his analysis during his testimony:

"A The, the example that * * * I was envisioning in writing this comment is * * * *if the master is running at a constant speed but a deck feeding the master is stopped or started like you were making a copy, and editing in the process of making a copy, a deck stopping and a deck starting, not the record deck but a playback deck, slows down and starts up. If you play that back, you end up by having that * * * inverse frequency swoop.*

"Q So what you're saying, although you clearly don't elucidate that in your report, is that that anomaly is coming from a third deck?

"A Potentially."

"Another indication is the change in audio texture that happens after the edit ahead of 'on each.' From here to the end of the tape, the recording has a much higher level of high frequency sounds. This is in significant contrast to what has come before it on the tape, and there is no way that this would have happened in a normal recording process.

"In summary, the staff o[f] Rex Recording & Video Post[9] agree in our professional opinion that the master from which our Certified Copies were made have been modified from the original court proceedings."

(Text and graphics omitted.) During the hearing, Gorsline listened to a portion of the master tape and testified that "[i]t sounds exactly the same as the copies that I was listening to and analyzed."

According to Gorsline, Kareta's report notes the same anomalies. With regard to the anomaly concerning the word "Robert," the report lists three possible causes from most to least likely:

"* * * The 4-track master tape machine was put into 'overdub' mode, during the copying of the tape used for analysis.

"* * * A portion of the Master tape was being erased, as the copy was being made.

"* * * A brown out condition was momentarily present during the copying process."

With regard to the anomaly concerning the phrase "either on each charge," the report indicates that the anomaly may have resulted from the recorder requesting "that the judge re-read the lines at a later time, due to a tape machine failure or lack of intelligibility in the words spoken." With regard to the phrase, "charge guilty or guilty," the report indicates that a "punch in" occurred "because the new recording is done while the rest of the audio on the tape is playing, and still audible." Additionally, the report indicates that "the word '[n]ot' has been eradicated in the Audio's Signal Voltage. Under this condition, the word '[n]ot' would have been removed only in a deliberate manner. There is no natural procedure[ ] that would end in this result."

---

[9] Gorsline is the general manager and an owner of Rex Recording & Video Post.

The third alleged alteration involves defendant's sentencing. Specifically, at the hearing, defendant testified that "[t]he entire sentencing section is edited. Like every time I listen to it, I'll find something new that's been changed from what I remember * * *."

There was also evidence that would have permitted Judge Barron to reject the testimony that the master tape had been altered. Robin Davidson, the court reporter during defendant's trial, testified that her responsibilities as a reporter include accurately recording the trial and keeping a trial log. She makes the recording on a machine with two tape decks. Davidson testified that, generally, a few minutes before the end of the tape that is recording the proceeding, there is a "beeping sound" that signals her to "hit the record button on the second tape deck and start recording on that tape." Davidson testified that she had listened to the tapes of defendant's trial a few days before the hearing and that a change in the tape had occurred at trial.

■■    Additionally, Gorsline testified that he had made no efforts to determine what the Coos County recording system was and that he had not tested the Coos County machine. Specifically, he testified:

"Q   Without being able to take into account the * * * Coos County recording system with its conversion process, how can you arrive at the conclusion that there's been a dubbing?

"A   * * * [T]he footprints shown in the example is not something that would ever happen in any * * * analog audio cassette recording.

"Q   Nothing ever?

"A   Nothing ever.

"Q   Absolutely not, positively, absolutely, could not ever happen?

"A   * * * [N]ot ever. If I had it in my studio, I could make it happen, potentially.

"Q   Okay. Let me ask you this, then. As the Coos County reporter is sitting there in front of the tape deck machine, and she notices that the tape is switching off, and

she hits the record button and it switches the heads or moves the deck from recording to one position to the next, may even in fact get bumped, what effect would that have on the master?

"A   It shouldn't have any effect on the master.

"Q   It shouldn't but you don't know for certain that it did not. Is that correct?

"A   I do not know for certain.

"Q   So the statement that something abnormal happened at each of these locations and that none of these would ever be found in a normal recording—

"A   That would not—

"Q   —is not entirely true, is it?

"A   That would not be a normal recording.

"* * * * *

"[JUDGE BARRON]:   Well, before you go on, then, a normal recording to you, if I understood his question and your answer, then somebody could hit a record button, bump it, do something, and that's not a normal recording?

"[GORSLINE]:   Well, that deck, from my limited experience with that particular deck, would not affect the recording deck by hitting a button to go into record on the secondary deck. It's a dual deck—dual deck system.

"[JUDGE BARRON]:   Correct. But I

"[GORSLINE]:   They are * * * unique * * * each to itself.

"[JUDGE BARRON]:   Right. But my understanding * * * of your understanding of normal, what you meant by normal is * * * if something happened, it got bumped, jiggled, whatever, something punched wrong, then that is not a normal recording?

"[GORSLINE]:   No. I would not call that something jiggled, punched wrong.

"[JUDGE BARRON]:   Abnormal.

"[GORSLINE]:   I would—double negatives.

"I can not [*sic*] foresee any instance in which that could happen and create a problem. *It is possible that under some circumstance that I cannot foresee that something could be made to malfunction.*"

(Emphasis added.) In sum, Gorsline testified:

"Q  * * * What efforts did you make to exclude the potential for Ms. Davidson to be repeatedly hitting the button or to be—even be making changes in the machine or bumping it in order to arrive at a conclusion that this court manipulated the tapes?

"A  I didn't allow for her to make any of those kinds of things in my conclusion.

"Q  The answer is none. Correct?

"A  None."

Although there is evidence from which the Judge Barron could have found that the master tape of defendant's trial had been altered, there is also evidence that permitted him to reject the evidence that an alteration occurred.[10] First, with regard to the objection, defendant asserts that the tape was altered to indicate that the district attorney objected instead of the judge. However, the Kareta report indicates that there was no alteration in the portion of the tape concerning the actual objection and that an anomaly occurs during defendant's testimony. On appeal, defendant does not assert that his testimony was altered. To the contrary, in defendant's first assignment of error he states that Judge Barron erred in stating that Judge Gillespie "had the duty to object to [d]efendant's testimony during the [t]rial, when [d]efendant was [i]mpeaching the credibility and honesty of the [p]rosecution's main witness"; thus, defendant's position

---

[10] A factfinder may reject even uncontroverted expert testimony. *See Tiedmann v. Radiation Therapy Consultants*, 299 Or 238, 244, 701 P2d 440 (1985) (reasoning that, in *W. R. Chamberlin & Co. v. Northwestern Agencies*, 289 Or 201, 611 P2d 652 (1980), it had held that, "because a jury may reject the uncontradicted opinion of a plaintiff's expert witness, denial of a directed verdict in favor of the plaintiff, *i.e.*, the party bearing the burden of proof, was proper"); *W. R. Chamberlin & Co.*, 289 Or at 207 (holding that "the jury may reject this conclusion because the weight of the opinion of an expert witness is a matter particularly within the province of the jury" and reasoning that, "[e]ven if a jury accepts that an expert witness has expressed an opinion which he believes to be entirely truthful, the jury may not be persuaded on the ultimate issue to be decided").

appears to be that his testimony is accurately reflected in the transcript. Second, with regard to the jury instruction, even though Gorsline testified that the master was altered at particular points, he also testified that (1) he had not tested the recording device that was used in Coos County, (2) he did not know for certain whether there would have been an effect on the master if the machine had been bumped or the recorder had hit the record button and had not considered those possibilities in arriving at his conclusion, and (3) it was "possible that under some circumstance that I cannot foresee that something could be made to malfunction." Finally, defendant never alerted Judge Barron to a particular alteration with regard to his sentencing. Instead, defendant testified that "[t]he entire sentencing section is edited. Like every time I listen to it, I'll find something new that's been changed from what I remember * * *."

Because, based on all of the evidence in this case, a reasonable factfinder could find that the master tape was not altered, we are bound by Judge Barron's finding on appeal. In light of Judge Barron's finding that the master tape had not been altered, he did not abuse his discretion in settling the record. Our conclusions resolve defendant's assignments of error and arguments concerning the hearing.

■ Defendant's first assignment of error also challenges two rulings that were made during his trial. First, defendant asserts that Judge Gillespie erred in failing to permit him to challenge the credibility of the victims. His argument concerns the following portion of his testimony:

"[DEFENSE COUNSEL]. Okay. Have there been other occasions that you have seen the dog in your yard and leave piles when he wasn't attended by the Brickeys?

"[DEFENDANT]. Uh, well, the dog—before the Brickeys lied to the police and had me arrested they would never use the leash.

"[DISTRICT ATTORNEY]: Objection, Your Honor. I ask that - - -

"[JUDGE GILLESPIE]: (Interposing) Sustained. That's not appropriate, [defense counsel].

"[DEFENSE COUNSEL]: Right.

"[JUDGE GILLESPIE]: Ask specific questions. And you answer them, sir. Do you understand?

"[DEFENDANT]: Yes."

Defendant did not preserve the issue that he raises on appeal. In particular, defense counsel apparently agreed with Judge Gillespie that defendant's comments on the victims' credibility were improper, did not assert any reason that defendant's testimony was admissible, and did not make an offer of proof as to the substance of the excluded testimony. *See* OEC 103(1)(b) (providing, in part, that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and * * * [i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked"); *State v. Smith*, 319 Or 37, 43-44, 872 P2d 966 (1994) (discussing principle).

■ Second, defendant asserts that Judge Gillespie erred in refusing to give Uniform Criminal Jury Instruction 1024, which provides:

"A witness who lies under oath in some part of his or her testimony is likely to lie in other parts of his or her testimony. Therefore, if you find that a witness has lied in some part of his or her testimony, then you may distrust the rest of that witness's testimony.

"Sometimes witnesses who are not lying may give incorrect testimony. They may forget matters or may contradict themselves. Also, different witnesses may observe or remember an event differently.

"You have the sole responsibility to determine what testimony, or portions of testimony, you will or will not rely on in reaching your verdict."

The state requested Uniform Criminal Jury Instruction 1024. Defendant's attorney told the court that he was not requesting any jury instructions and that he had no objection to the instructions requested by the state. The following discussion then occurred between Judge Gillespie, defense counsel, and the district attorney:

"[JUDGE GILLESPIE]: I'm real reluctant to give 10[ ]24 'Witness False in Part[.'] Are you requesting it be given as well?

"[DEFENSE COUNSEL]: No.

"[JUDGE GILLESPIE]: * * * I don't think there's a factual basis to give the witness false in part instruction. I don't like it; never have liked it and give it only reluctantly when there's a factual basis and I see none in this instance.

"[DISTRICT ATTORNEY]: Your Honor, I understand the Court['s] concerns and the State does not have a problem with having that one deleted.

"[JUDGE GILLESPIE]: Okay. Thanks."

Here, defendant did not request that Judge Gillespie give Uniform Criminal Jury Instruction 1024. Although the state requested that instruction, the state had no objection to deleting it when Judge Gillespie indicated that he had concerns. At that point, defendant did not assert that that instruction should be given. Additionally, defendant did not except to the jury instructions after they were given. Under those circumstances, defendant did not preserve for appellate review the issue of Judge Gillespie's failure to give Uniform Criminal Jury Instruction 1024 because he never brought the alleged error to the judge's attention so that it could be corrected. *See State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) ("[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted.").

In sum, because there is evidence to support Judge Barron's finding that the master tape was not altered, Judge Barron did not abuse his discretion in settling the record. Additionally, to the extent that defendant is challenging Judge Gillespie's refusal to allow him to challenge the credibility of the victims and failure to give a particular jury instruction, defendant did not preserve those issues at trial. Defendant's other arguments do not merit discussion.

Affirmed.